UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------X
FREDDIE MCGRIER,                              :
                              Plaintiff,      :
                                              :
                                              :
                -against-                     :
                                              :
CITY OF NEW YORK, DEREK LYNTON, RAY           :
VALERIO, ROBERT HENN, FELIX RAMOS,            :
RICHARD GIBSON, DANIEL ROBLES,                :
ANTHONY D'AMATO, THOMAS AASHEIM,              :
and JOHN THOMPSON,                            :
                                              :
                              Defendants.     :
-------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/11/2019

16-CV-5667 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

Plaintiff Freddie McGrier has sued the City of New York (the "City") and members of

the New York City Police Department ("NYPD"), the New York City Department of Correction

("DOC"), and the Bronx County District Attorney's Office (the "DA's Office") for malicious

prosecution, false arrest, excessive force, and related claims, pursuant to 42 U.S.C. § 1983 and

state law. *See* Second Amended Complaint ("SAC"), Dkt. 50. Defendants have moved for

summary judgment, pursuant to Federal Rule of Civil Procedure 56. *See* Defs.' Notice of Mot.,

Dkt. 86. For the following reasons, Defendants' motion is GRANTED.

## BACKGROUND[1]

### I. Plaintiff's Prosecution

#### A. The September 4, 2012 Murder and Investigation

On September 4, 2012, a gas station in the Bronx was robbed at gunpoint. *See* Def.'s

56.1 Stmt., Dkt. 89, ¶¶ 19–20; Pl.'s 56.1 Stmt., Dkt. 102-7, ¶¶ 19–20. The assailant demanded

---

[1]    All facts herein are undisputed unless otherwise stated. The Court will refer to the exhibits to the
Declaration of Carolyn K. Depoian, Dkt. 87, as "Defs.' Exs." The Court will refer to the exhibits to the Declaration

money from one of the gas station's attendants, Jason Mwewa, and then shot and killed another of the gas station's employees.  Defs.' 56.1 Stmt. ¶¶ 14, 19–20; Pl.'s 56.1 Stmt. ¶¶ 14, 19–20.

The NYPD investigated the murder.  The night of the incident, members of the NYPD's 48th Precinct Detective Squad, including Defendants Robert Henn, Felix Ramos, Richard Gibson, and Thomas Aasheim, responded to the scene and interviewed Mwewa; in the following days, they also canvassed the neighborhood, obtained surveillance video from the gas station, disseminated images of the assailant to the press, and offered a reward for information about the crime.  *See* Defs.' 56.1 Stmt. ¶¶ 15, 17, 18; Pl.'s 56.1 Stmt. ¶¶ 15, 17, 18; Defs.' Ex. G at D161, D164; Pl.'s Ex. A at 95–96; Pl.'s Ex. B at D36–D37, D69, D104.  The NYPD's Crime Scene Unit ("CSU") also collected DNA and other physical evidence.  *See* Defs.' 56.1 Stmt. ¶¶ 21–23; Pl.'s 56.1 Stmt. ¶¶ 21–23.

A few days after the murder, the owner of a nearby bodega notified the police that he recognized the assailant as one of his customers, a man named David Baltazar.  *See* Defs.' 56.1 Stmt. ¶ 25; Pl.'s 56.1 Stmt. ¶¶ 25, 97; Defs.' 56.1 Resp. Stmt., Dkt. 105, ¶ 97.  The police arrested Baltazar and placed him in a lineup; Mwewa, however, failed to make an identification.  *See* Defs.' 56.1 Stmt. ¶¶ 26–27; Pl.'s 56.1 Stmt. ¶¶ 26–27; Defs.' Ex. G at D99, D106, D171–D174.  Accordingly, the police released Baltazar without charging him.  *See* Defs.' Ex. G at D106.

Shortly thereafter, two members of the public told the police that Plaintiff had confessed to them to having committed the murder.  *See* Defs.' 56.1 Stmt. ¶¶ 28–29; Pl.'s 56.1 Stmt. ¶¶ 28–29; Defs.' Ex. I at D436–D442.  Following this tip, Aasheim showed Mwewa a photo array

---

of Ellie A. Silverman, Dkt. 102-2, as "Pl.'s Exs."  The Court will refer to the Declaration of Joseph A. Pollini, Dkt. 102-1, as "Pollini Decl."

containing Plaintiff's picture; Mwewa positively identified Plaintiff as the murderer. *See* Defs.'
56.1 Stmt. ¶¶ 30–31; Pl.'s 56.1 Stmt. ¶¶ 30–31.

The police subsequently arrested Plaintiff and placed him in a lineup. *See* Defs.' 56.1
Stmt. ¶ 33; Pl.'s 56.1 Stmt. ¶ 33; Defs.' Ex. G at D118. Mwewa told Ramos that all suspects in
the lineup other than Plaintiff were not the murderer, but Mwewa refused definitively to identify
Plaintiff as the perpetrator. *See* Defs.' 56.1 Stmt. ¶ 34; Pl.'s 56.1 Stmt. ¶¶ 34, 99; Defs.' 56.1
Resp. Stmt. ¶ 99; Defs.' Ex. G at D184; Defs.' Reply Ex. J-2, Dkt. 104-1, at 13–14. During this
time, Mwewa was "sweating heavily," and Ramos believed that he had refused to identify
Plaintiff out of fear. Defs.' Ex. J at 15; *see also* Defs.' 56.1 Stmt. ¶¶ 35–36; Pl.'s 56.1 Stmt.
¶¶ 35–36.

### B. Plaintiff's Charges and Trial

Following Plaintiff's lineup, Ramos contacted prosecutors in the DA's Office and
discussed the evidence that the police had gathered against Plaintiff. *See id.* The DA's Office
told the police to charge Plaintiff with the murder. *See id.* at 24; *see also* Defs.' Ex. G at D118.
Plaintiff was subsequently arrested and indicted for murder, robbery, and criminal possession of
a weapon. *See* Defs.' 56.1 Stmt. ¶ 41–42; Pl.'s 56.1 Stmt. ¶ 41–42.

Plaintiff was tried and acquitted on these charges in October 2015. *See* Defs.' 56.1 Stmt.
¶ 46, 49; Pl.'s 56.1 Stmt. ¶ 46, 49. At trial, Mwewa testified and identified Plaintiff as the
murderer. *See* Defs.' 56.1 Stmt. ¶¶ 47–48; Pl.'s 56.1 Stmt. ¶¶ 47–48. Additionally, one of the
informants who had tipped off the police about Plaintiff also testified. *See* Defs.' Ex. I at 221–
27.

## II.     Plaintiff's Incarceration

Between September 2012 and October 2015, Plaintiff was detained pending trial at the Rikers Island prison complex. *See* Defs.' 56.1 Stmt. ¶ 50; Pl.'s 56.1 Stmt. ¶ 50.

### A.     The July 15, 2013 Cell Extraction

In July 2013, Plaintiff was housed in a solitary unit at Rikers Island known as the Central Punitive Segregation Unit ("CPSU"). *See* Defs.' 56.1 Stmt. ¶ 60; Pl.'s 56.1 Stmt. ¶ 60. Plaintiff's cell door contained a small slot, known as a "cuffing port," through which inmates are handcuffed before leaving their cells and after being returned to their cells. *See* Defs.' 56.1 Stmt. ¶ 61; Pl.'s 56.1 Stmt. ¶ 61.   On July 15, 2013, Plaintiff placed his hands into the cuffing port, preventing it from closing. *See* Defs.' 56.1 Stmt. ¶ 62; Pl.'s 56.1 Stmt. ¶ 62. Plaintiff testified in his deposition that he was "trying to get out of [his] cell" at the time. Defs.' 56.1 Stmt. ¶ 63; Pl.'s 56.1 Stmt. ¶ 63.   Inmates who place their hands into the cuffing ports pose a safety concern because of the risk that they could be holding a weapon or preparing to throw objects out of the cell; accordingly, when an inmate prevents a cuffing port from closing, the entire unit is locked down until the prisoner's hand is removed. *See* Defs.' Ex. C at 41–42.

Corrections officers ordered Plaintiff to remove his hand from the cuffing port, but Plaintiff refused. *See* Defs.' 56.1 Stmt. ¶¶ 64, 67; Pl.'s 56.1 Stmt. ¶¶ 64, 67.   After a mental health professional spoke with Plaintiff, corrections officers assembled an extraction team. *See* Defs.' 56.1 Stmt. ¶ 66; Pl.'s 56.1 Stmt. ¶ 66.   Although the extraction team, which included Defendant Daniel Robles, repeatedly sprayed Plaintiff with a chemical agent through the cuffing port, Plaintiff still refused to remove his hand. *See* Defs.' 56.1 Stmt. ¶¶ 59, 68; Pl.'s 56.1 Stmt. ¶¶ 59, 68; Defs.' Ex. Q at 8:15–9:12.   The extraction team then attempted to enter Plaintiff's cell, led by an officer carrying a shield. *See* Defs.' 56.1 Stmt. ¶ 70; Pl.'s 56.1 Stmt. ¶ 70.   Plaintiff

charged the shield, preventing the team from entering the cell.[2]  *See* Defs.' 56.1 Stmt. ¶ 71; Defs.' Ex. Q at 9:00–9:45.  The team pushed past Plaintiff and entered the cell.  *See* Defs.' 56.1 Stmt. ¶ 72; Defs.' Ex. Q at 9:40–9:55.

What happened inside Plaintiff's cell is a matter of dispute.  According to Defendants, Plaintiff forcibly resisted while Robles and the other officers attempted to handcuff him. *See* Defs.' 56.1 Stmt. ¶ 73.  According to Plaintiff, he did not resist the officers, and they punched and kicked him after he was handcuffed.  *See* Pl.'s Mem. of Law, Dkt. 101, at 6, 20–21. Plaintiff asserts that he suffered permanent visual impairment from this incident, *see* Pl.'s 56.1 Stmt. ¶ 76 (citing Pl.'s Ex. C at 223); citing medical records, Defendants assert that Plaintiff suffered no visual impairment, *see* Defs.' 56.1 Stmt. ¶ 76 (citing Defs.' Exs. Q, R).[3]  Although these facts are disputed, the dispute is not material.

**B.      The October 12, 2013 Slip-and-Fall**

On October 12, 2013, Plaintiff slipped on a wet floor in the shower area of Rikers Island. *See* Defs.' 56.1 Stmt. ¶ 81; Pl.'s 56.1 Stmt. ¶¶ 81, 116; Defs.' 56.1 Resp. Stmt. ¶ 116.  Plaintiff was handcuffed and being led out of the shower area by a corrections officer at the time. *See* Pl.'s 56.1 Stmt. ¶¶ 117–118; Defs.' 56.1 Resp. Stmt. ¶¶ 117–118.

---

[2]      Citing to his deposition, Plaintiff argues that he did not refuse to remove his hand after being sprayed with the chemical agent and that he did not charge the extraction team's shield.  *See* Pl.'s 56.1 Stmt. ¶¶ 69, 71 (citing Defs.' Ex. D at 218).  The cited page of his deposition does not support Plaintiff's assertion.  *See* Defs.' Ex. D at 218.  In any event, a video of the incident makes clear that Plaintiff refused to remove his hand after being sprayed and charged the extraction team's shield.  *See* Defs.' Ex. Q at 8:15–9:45.

[3]      Plaintiff also asserts that his "right eyelid was split open as a result of the incident," Pl.'s 56.1 Stmt. ¶ 75 (citing Pl.'s Ex. C at 221); the page of Plaintiff's deposition that he cites for this point, however, was not included in the submissions that the parties filed with this Court.  Moreover, the video recording of the extraction shows that Plaintiff did not have visual injuries to his face after the extraction was complete.  *See* Defs.' Ex. Q at 10:45–10:55, 11:18, 11:40–11:55, 12:10–12:30.

## DISCUSSION

### I.    Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). Courts "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (per curiam) (quoting *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 79–80 (2d Cir. 2009)).

### II.    All Claims Against Aasheim, Thompson, Lynton, and Valerio Are Dismissed

Before turning to the merits of Plaintiff's claims, several Defendants warrant dismissal as a matter of law. First, Thomas Aasheim, a police officer, and John Thompson, a corrections officer, were never served with process, despite having been named as Defendants more than 18 months ago. *See* Defs.' 56.1 Stmt. ¶¶ 6–7. Over a year ago, this Court specifically told Plaintiff to serve these parties promptly, *see* Tr. of Nov. 3, 2017 Conf. at 2; inexplicably, Plaintiff failed to do so. In his response to Defendants' motion for summary judgment, Plaintiff acknowledges that these Defendants were never served, and Plaintiff offers no explanation—let alone any good cause—for the failure to serve. *See* Pl.'s 56.1 Stmt. ¶¶ 6–7. Accordingly, all claims against Aasheim and Thompson are DISMISSED for failure to serve. *See* Fed. R. Civ. P. 4(m).

Plaintiff also sued two Assistant District Attorneys ("ADAs"), Derek Lynton and Ray Valerio. Because Lynton and Valerio are entitled to absolute immunity, *see* Defs.' Mem. of Law, Dkt. 88, at 18–21, Plaintiff has agreed to dismiss these Defendants, *see* Pl.'s Mem. of Law at 1, 8 n.4. Accordingly, all claims against Lynton and Valerio are DISMISSED.[4]

Additionally, Plaintiff sued Anthony D'Amato, a police officer, for, *inter alia*, malicious prosecution and false arrest. The parties agree that D'Amato's only involvement in Plaintiff's prosecution was to collect DNA evidence from the murder scene, *see* Defs.' 56.1 Stmt. ¶ 24; Pl.'s 56.1 Stmt. ¶ 24; thus, Plaintiff has agreed to dismiss all claims against D'Amato, *see* Pl.'s Mem. of Law at 8 n.4. Accordingly, all claims against D'Amato are DISMISSED.[5]

## III. Defendants' Motion for Summary Judgment Is Granted on Plaintiff's Claims Relating to His Arrest and Prosecution for Murder

Plaintiff brings a number of claims against Henn, Ramos, and Gibson (the "Police Defendants") in connection with his arrest and prosecution, including claims for malicious prosecution, "deprivation of rights," false arrest, wrongful imprisonment, negligent prosecution, failure to intervene, and intentional infliction of emotional distress ("IIED"), pursuant to § 1983

---

[4]    Defendants assert that they repeatedly asked Plaintiff to withdraw his claims against Lynton and Valerio, due to these parties' absolute immunity from suit. *See* Defs.' Reply Mem. of Law, Dkt. 103, at 1 n.1. According to Defendants, Plaintiff refused to dismiss these parties, requiring Defendants to spend time and pages moving for summary judgment on the claims against these parties—before Plaintiff simply agreed to dismiss these parties in his response brief. *See id.* If Defendants' version of these facts is correct, then Plaintiff's counsel has needlessly wasted the time and resources of her adversary and this Court. This Court has warned Plaintiff's counsel against engaging in these types of wasteful and dilatory tactics. *See* Tr. of Nov. 3, 2017 Conf. at 13. Plaintiff's counsel is again warned that this conduct will not be tolerated in the future.

[5]    To be clear, Plaintiff's response papers state that he agrees to dismiss D'Amato only from his § 1983 claim for malicious prosecution. *See* Pl.'s Mem. of Law at 8 n.4. Plaintiff sued D'Amato for a number of other claims, including false arrest and intentional infliction of emotional distress. *See* SAC. Plaintiff, however, offers no basis for holding D'Amato liable for these claims; indeed, other than the statement withdrawing the § 1983 claim against D'Amato, Plaintiff's response papers do not mention D'Amato even once. Summary judgment is therefore appropriate on all claims against D'Amato.

and New York State law.  *See* SAC ¶¶ 111–131, ¶¶ 144–173.  The Police Defendants move for summary judgment on these claims.

## A.  Malicious Prosecution

### 1.  The Applicable Law

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law."  *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted) (collecting cases).  "To establish a malicious prosecution claim under New York law, a plaintiff must prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'"  *Id.* (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)).

### 2.  Henn, Ramos, and Gibson Did Not "Initiate" Criminal Proceedings Against Plaintiff

"To initiate a prosecution, a defendant must do more than report the crime or give testimony.  He must 'play[] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'"  *Manganiello*, 612 F.3d at 163 (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000)).  Merely "reporting . . . a crime" or "giving testimony" is insufficient to establish this element.  *Rohman*, 215 F.3d at 217 (collecting cases).  Rather, the plaintiff must show that the defendant "distorted the process by which plaintiff was brought to trial," such as by "creat[ing] false information and forward[ing] it to prosecutors" or by withholding "relevant and material information" from prosecutors.  *Breeden v. City of New York*, No. 09–CV–4995, 2014 WL 173249, at *10 (E.D.N.Y. Jan. 13,

2014); *see also Manganiello,* 612 F.3d at 160; *Bailey v. City of New York*, 79 F. Supp. 3d 424, 448–49 (E.D.N.Y. 2015) (collecting cases).

Plaintiff points to no evidence in the record from which a reasonable juror could infer that any of the Police Defendants initiated Plaintiff's prosecution. Plaintiff's prosecution was initiated shortly after he appeared in a lineup, after Ramos called a prosecutor in the DA's Office, notified him of the evidence against Plaintiff, and received an instruction to charge Plaintiff with the murder. *See* Defs.' Ex. J at 24 (Ramos deposition testimony that "[a]fter conferring with the District Attorney, we were informed to make an arrest in this case. . . . [W]e were told to go forward and make an arrest."); *see also* Defs.' Ex. G at D118 (police report stating that Plaintiff was charged with homicide after a "conferral" between an assistant district attorney and the homicide supervisor in the DA's Office).[6] As to Ramos, therefore, Plaintiff's claim fails, as the record contains no evidence that Ramos did anything except report the results of his investigation to prosecutors and allow them to decide whether to charge Plaintiff with the murder. *See Rohman*, 215 F.3d at 217 ("[t]he mere reporting of a crime" is insufficient to establish the "initiation" of a prosecution); *Bailey*, 79 F. Supp. 3d at 449; *Breeden*, 2014 WL 173249, at *10; *Present v. Avon Prods., Inc.*, 253 A.D.2d 183, 189 (1st Dep't 1999) ("One who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding."). As to Henn and Gibson, Plaintiff's claim also fails, as he offers no evidence whatsoever that they participated in calls with the DA's Office,

---

[6] Plaintiff argues that the decision to charge Plaintiff was made "mutually" between Ramos and the DA's Office, as Ramos "advised the prosecutor concerning the appropriate course of action" during his telephone call. Pl.'s Mem. of Law at 9; *see also id.* at 4; Pl.'s 56.1 Stmt. ¶¶ 39–40, 100. Plaintiff, however, cites no evidence for this assertion other than a document that was not included in the parties' submissions, *see* Pl.'s 56.1 Stmt. ¶ 100 (citing Pl.'s Ex. B at D11), and a page from Ramos's deposition, *see id.* (citing Defs.' Ex. J at 24). In that portion of the deposition, Ramos testified that the DA's Office *instructed him* "to go forward and make an arrest," Defs.' Ex. J at 24. There is, therefore, no basis in the record to infer that the decision to charge Plaintiff was made "mutually" between the Police Defendants and the DA's Office.

filled out corroborating affidavits, or otherwise played "an active role in the prosecution." *Manganiello*, 612 F.3d at 163.

Plaintiff argues that the Police Defendants "distorted" the process with which Plaintiff was prosecuted by misrepresenting and withholding relevant information from prosecutors. Pl.'s Mem. of Law at 11. First, Plaintiff argues that the Police Defendants failed to investigate—and thus withheld from prosecutors—Plaintiff's "alibi," that is, a statement that he made to the Police Defendants that he was in Manhattan on the night of the murder (which took place in the Bronx). *See id.* at 8–10; Pl.'s 56.1 Stmt. ¶ 113. Plaintiff's argument fails. After hearing Plaintiff's "alibi," the Police Defendants obtained his cell phone records, which showed that he was in the Bronx, not Manhattan, on the night of the murder. *See* Defs.' 56.1 Resp. Stmt. ¶ 113 (citing Pl.'s Ex. A at 50). Because they investigated and debunked this "alibi," no reasonable juror could infer that the Police Defendants "distorted" Plaintiff's prosecution by failing to investigate his alibi.[7]

Plaintiff also argues that the Police Defendants withheld from prosecutors the fact that Plaintiff was "four inches taller" and darker-skinned than the description of the perpetrator that Mwewa provided on the night of the murder. Pl.'s Mem. of Law at 2, 10; Pl.'s 56.1 Stmt. ¶¶ 90, 96, 101. Plaintiff again mischaracterizes the record. Both Mwewa's description and Plaintiff's actual appearance were documented in the police's case file, which the Police Defendants turned over to prosecutors. *See* Defs.' Ex. G at D41, D182; Defs.' Ex. K at D1; Pl.'s Ex. U, Dkt. 104-2,

---

[7]     Plaintiff points out that the evidence that the Police Defendants investigated his alibi is based entirely on their deposition testimony, as Plaintiff's cell phone records are not in the police's case file. *See* Pl.'s 56.1 Stmt. ¶ 113. From this premise, Plaintiff leaps to the conclusion that the Police Defendants must not have obtained the records. *See id.* To support this assertion, Plaintiff cites to the declaration of his expert witness, who stated that, in his opinion, "[i]f information is not properly documented in a case, then it did not happen." Pollini Decl. ¶ 31. This conclusion is far too speculative to be admissible expert opinion—and, in fact, defies common sense and borders on frivolous. Plaintiff offers no admissible evidence to dispute the Police Defendants' deposition testimony that they investigated his alibi.

at 19. Plaintiff is, therefore, incorrect that the Police Defendants withheld this information. In any event, these slight differences from Mwewa's description carry little to no investigative value, considering that Mwewa subsequently identified Plaintiff in a photo array (which Plaintiff does not argue was suggestive or otherwise unfair).[8] *See* Defs.' 56.1 Stmt. ¶ 31; Pl.'s 56.1 Stmt. ¶ 31.

Additionally, Plaintiff argues that Ramos's description of his lineup to prosecutors was not "balanced [and] unbiased" because Ramos unfairly "jumped to the conclusion" that Mwewa was too frightened to identify Plaintiff. Pl.'s Mem. of Law at 10–11; *see also id.* at 3–4. But Plaintiff points to no evidence that Ramos lied, exaggerated, or otherwise mischaracterized what happened at the lineup to the prosecutors; to the contrary, all aspects of the lineup were documented in the police's case file, including Mwewa's statements and body language during the procedure.[9] *See* Defs.' Ex. G at D182–D186.

Finally, Plaintiff argues that the Police Defendants failed to conduct searches and canvasses to determine whether Plaintiff possessed a bicycle or a blue hoodie, both of which were used by the assailant when he robbed the gas station. *See* Pl.'s Mem. of Law at 4, 10–11; Pl.'s 56.1 Stmt. ¶¶ 102–104. Plaintiff's assertions again have no basis in the record. The police's case file indicates that numerous canvasses of the neighborhood surrounding the gas station were conducted in the days following the murder. *See* Pl.'s Ex. B at D36–D37. Although

---

[8]     Plaintiff argues that "[a]t some point during the investigation," Mwewa viewed a different photo array containing Plaintiff's picture and failed to identify Plaintiff in the array. Pl.'s 56.1 Stmt. ¶ 110 (citing Pl.'s Ex. B at D35); *see also* Pl.'s Mem. of Law at 3. The document that Plaintiff cites does not support this assertion, *see* Pl.'s Ex. B at D35, and the Court is unaware of any other evidence that supports it. Additionally, Plaintiff argues that the photo of Plaintiff in the array was more than six years old, *see* Pl.'s 56.1 Stmt. ¶ 112, but, again, the evidence that Plaintiff cites for this assertion does not support it.

[9]     The case file, for example, states that Mwewa was "sweating heavily" during the lineup and that Mwewa repeatedly told Ramos, "I won't give or say the number." Defs.' Ex. G at D184.

the police did not recover the bicycle or hoodie, nor did they search Plaintiff's residence for these objects, *see* Pl.'s 56.1 Stmt. ¶¶ 102, 104; Defs.' 56.1 Resp. Stmt. ¶¶ 102, 104, that hardly vitiates the probable cause for Plaintiff's prosecution (given the likelihood that a savvy perpetrator would have discarded these items). *See Panetta v. Crowley*, 460 F.3d 388, 396 (2d Cir. 2006) ("[O]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001))). In any event, given that the police's case file was turned over to the DA's Office, there is no indication that the Police Defendants lied to prosecutors about the absence of this evidence or otherwise distorted the evidence against Plaintiff.

For all these reasons, no reasonable juror could find that any of the Police Defendants initiated Plaintiff's prosecution.

### 3.    There Was Probable Cause for Plaintiff's Prosecution

"Probable cause requires an officer to have 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Panetta*, 460 F.3d at 395 (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (citation omitted)). Although probable cause "does not require absolute certainty," *id.* (quoting *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003)), "an officer may not disregard plainly exculpatory evidence" in the course of an investigation, *id.* (citing *Kerman v. City of New York*, 261 F.3d 229, 241 (2d Cir. 2001)). "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Manganiello*, 612 F.3d at 161–62 (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)).

An "indictment by a grand jury creates a presumption of probable cause." *Id.* "That presumption may be rebutted only 'by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Id.* (quoting *Savino*, 331 F.3d at 72); *see also Rothstein v. Carriere*, 373 F.3d 275, 284 (2d Cir. 2004).

Plaintiff was indicted by a grand jury in September 2012. *See* Defs.' 56.1 Stmt. ¶ 42; Pl.'s 56.1 Stmt. ¶ 42. Plaintiff offers no evidence to rebut the presumption of probable cause, other than his arguments that the Police Defendants "withheld" evidence about Plaintiff's alibi, the differences between Mwewa's description and Plaintiff's appearance, and the failure of police to find the perpetrator's bicycle and hoodie. *See* Pl.'s Mem. of Law at 14. As the Court has discussed, these arguments have no basis in the record. Even if they did, they would not rebut the presumption that Plaintiff's prosecution was supported by probable cause. *See Hayes v. City of New York*, No. 12-CV-4370, 2014 WL 4626071, at *10 (S.D.N.Y. Sept. 15, 2014) ("a purportedly inadequate investigation" does not rebut an indictment's presumption of probable cause).

Even if Plaintiff had not been indicted, there would have been more than enough evidence to establish probable cause for his prosecution. After two informants told the police that Plaintiff was responsible for the murder, Mwewa identified Plaintiff from a photo array. Because Mwewa was an innocent "bystander with no apparent motive to falsify," his identification carried "a peculiar likelihood of accuracy." *Panetta*, 460 F.3d at 395 (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 163 (2d Cir. 2002)). It is well-established that "[a] positive photo identification by an eyewitness is normally sufficient to establish probable cause

to arrest." *Celestin v. City of New York*, 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008) (collecting cases); *see also Panetta*, 460 F.3d at 395.[10]

Plaintiff argues that any probable cause "dissipated" after Mwewa failed to identify him in the lineup. *See* Pl.'s Mem. of Law at 13–14. In order for probable cause to dissipate, however, "the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (citing *Callan v. State,* 73 N.Y.2d 731 (1988)). Although Mwewa did not positively identify Plaintiff during the lineup, he excluded all other suspects in the lineup and appeared visibly frightened during the procedure. Under these circumstances, Mwewa's non-identification did not come close to showing that Plaintiff's prosecution was "groundless."

Plaintiff also argues that lapses in the police's DNA-collection procedures caused probable cause to dissipate. *See* Pl.'s Mem. of Law at 2, 15. When the police first processed the crime scene, they collected a number of DNA samples, but they failed to swab the inside of Mwewa's pants pockets for DNA; because the assailant had rifled through the pants pockets, he could possibly have left DNA evidence in them. *See* Defs.' 56.1 Stmt. ¶ 23; Pl.'s 56.1 Stmt. ¶¶ 23, 105; Defs.' 56.1 Resp. Stmt. ¶ 105. Gibson testified in his deposition that the police should have collected DNA from the pants pockets. *See* Pl.'s Ex. A at 84–85. As the Court has stated, however, "a purportedly inadequate investigation" does not vitiate probable cause. *Hayes*, 2014 WL 4626071, at *10; *see also Panetta*, 460 F.3d at 395–96 ("Although a better procedure may [be] for the officers to investigate plaintiff's version of events more completely, the arresting

---

[10]     Even if this evidence were not sufficient to establish probable cause—which it is—because the Police Defendants are entitled to qualified immunity, they need only show that the prosecution was supported by "arguable" probable cause in order to prevail on these claims. *Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001).

officer does not have to prove plaintiff's version wrong before arresting him. Nor does it matter that an investigation might have cast doubt upon the basis for the arrest." (quoting *Curley*, 268 F.3d at 70)).[11]

Additionally, in mid-2015, the City's Office of the Chief Medical Examiner excluded Plaintiff as a contributor from all DNA samples from the crime scene "where comparisons could be made." Def.'s 56.1 ¶ 44; Pl.'s 56.1 ¶¶ 44, 115; Def.'s 56.1 Resp. ¶ 115. In Plaintiff's view, this evidence established that the charges against him were groundless. *See* Pl.'s Mem. of Law at 15. But these DNA results were obtained nearly three years after Plaintiff's arrest and indictment; by that time, "custody of the case [had been] transferred from the police to prosecutors." *Fappiano v. City of New York*, No. 01-CV-2476, 2015 WL 94190, at *14 (E.D.N.Y. Jan. 7, 2015), *aff'd*, 640 F. App'x 115 (2d Cir. 2016); *see also Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994) ("Once the grand jury indicted [the plaintiff], control of the prosecution passed to the prosecutor and was no longer within the agent's authority."). Thus, "[e]ven assuming *arguendo* that probable cause can 'dissipate' after the grand jury indictment has been filed," the Police Defendants would not be liable for failing to further investigate after the DNA results were returned because the Police Defendants did not have "control over [Plaintiff's] case" at the time. *Fappiano*, 2015 WL 94190, at *14 (quoting *Wilson v. City of New York*, 480 F. App'x 592, 595 (2d Cir. 2012)); *see also Panetta*, 460 F.3d at 395 ("When determining whether probable cause exists courts must consider those facts *available to the*

---

[11]     The Court also notes that Plaintiff offers no evidence that the failure to collect DNA from inside the victim's pockets was motived by malice, which is an element of a malicious prosecution claim. Rather, Gibson testified in his deposition that DNA was not collected from the pants pockets because Gibson was unaware at the time that DNA could be collected from clothing. *See* Pl.'s Ex. A at 84. Gibson testified that "if [he] had known at the time that [he] could get the DNA from the pants," he would have swabbed them for DNA. *Id.* at 85.

*officer* at the time of the arrest and immediately before it." (emphasis in original) (quoting *Caldarola*, 298 F.3d at 162)); *Bernard*, 25 F.3d at 104.[12]

Finally, Plaintiff relies on his expert witness's opinion that the Police Defendants "violated accepted and standard police practices and procedures" in connection with Plaintiff's investigation and that "[n]o responsible police officer could have concluded that there was probable cause" to prosecute Plaintiff. Pollini Decl. ¶¶ 40–41. This witness's opinion does not change the Court's analysis. Plaintiff offers no argument why the failure to follow best-practice procedures vitiates probable cause; as the Court has explained, the law is to the contrary. *See Panetta*, 460 F.3d at 395–96; *Hayes*, 2014 WL 4626071, at *10. In any event, whether probable cause exists is a question of law for the Court, not an expert witness.

For all these reasons, no reasonable juror could find that Plaintiff's prosecution lacked probable cause. Accordingly, Defendants' motion for summary judgment is granted as to Plaintiff's § 1983 and state-law claims for malicious prosecution.

### B. Plaintiff's Other Claims Relating to His Arrest and Prosecution for Murder

Defendants' motion for summary judgment is also granted as to the balance of Plaintiff's claims relating to his arrest and prosecution. As to Plaintiff's claims for false arrest and wrongful imprisonment, probable cause is a complete defense, *see Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007); *Arum v. Miller*, 331 F. Supp. 2d 99, 109 (E.D.N.Y. 2004); thus, these claims fail for the reasons described *supra*. As to the claims for deprivation of rights and negligent prosecution, Defendants moved for summary judgment on these claims, *see* Defs.'

---

[12]  In any event, the DNA evidence did not establish that the charges against Plaintiff were groundless. The City Medical Examiner excluded Plaintiff as a DNA contributor only "where comparisons could be made," Def.'s 56.1 ¶ 44; Pl.'s 56.1 ¶ 44; other DNA samples from the crime scene had been insufficient for testing, *see* Def.'s 56.1 ¶ 45; Pl.'s 56.1 ¶ 45, leaving open the possibility that Plaintiff could have been a contributor to those samples.

Mem. of Law at 6, 30–31, but Plaintiff failed to address these claims in his response papers; accordingly, Plaintiff has abandoned these claims. *See Camarda v. Selover*, 673 F. App'x 26, 30 (2d Cir. 2016); *Jackson v. Federal Express*, 766 F.3d 189, 195 (2d Cir. 2014). In addition, "deprivation of rights" and "negligent prosecution" are not recognized causes of action under either § 1983 or New York law. *See Patterson v. Cty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004); *Mitchell v. Cty. of Nassau*, No. 05-CV-4957, 2007 WL 1580068, at *13 (E.D.N.Y. May 24, 2007). Accordingly, Defendants' motion for summary judgment is granted on these claims, too.

As to Plaintiff's claim for failure to intervene, that claim requires proof that the defendant had reason to know of a constitutional violation committed by a law enforcement individual. *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). As the Court has discussed, no reasonable juror could find that Plaintiff suffered a constitutional violation with respect to his arrest and prosecution; thus, the claim for failure to intervene fails. Additionally, Plaintiff's response papers address this claim only in the context of his claim for excessive force (which arises out of the July 15, 2013 cell extraction), not his claim for malicious prosecution; accordingly, Plaintiff has abandoned his claim for failure to intervene with respect to the prosecution.

Finally, Plaintiff's claim for IIED requires proof of "severe emotional distress," that is, distress "so severe that no reasonable [person] could be expected to endure it." *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 490 (S.D.N.Y. 2013) (quoting *Wiener v. Unumprovident Corp.*, 202 F. Supp. 2d 116, 122 (S.D.N.Y. 2002)); *see also Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993); *Allam v. Meyers*, 906 F. Supp. 2d 274, 282–83 (S.D.N.Y. 2012) (collecting cases); *Pepe v. Maklansky*, 67 F. Supp. 2d 186, 187 n.1 (S.D.N.Y. 1999). Plaintiff offers no evidence

that he suffered severe emotional distress; instead, Plaintiff requests an opportunity to submit supplemental briefing on the matter using expert testimony. *See* Pl.'s Mem. of Law at 27–28. Expert discovery, however, closed months before Defendants filed their motion for summary judgment. *See* Order (Feb. 2, 2018), Dkt. 80 (order requiring that expert discovery on all subjects other than damages be completed by April 30, 2018). Plaintiff provides no excuse for failing to conduct expert discovery on this matter.[13] And, in any event, Plaintiff offers no non-expert evidence to prove emotional distress, such as testimony from Plaintiff or Plaintiff's medical records. Accordingly, based on the present record, no reasonable juror could find that Plaintiff suffered severe emotional distress; thus, Defendant's motion for summary judgment is granted as to Plaintiff's IIED claim.

For all the foregoing reasons, Defendants' motion for summary judgment is granted on all of Plaintiff's claims relating to his arrest and prosecution, including the claims for malicious prosecution, deprivation of rights, false arrest, wrongful imprisonment, negligent prosecution, failure to intervene, and IIED.

## IV. Defendants' Motion for Summary Judgment Is Granted on Plaintiff's Claims Relating to the July 15, 2013 Cell Extraction

Plaintiff sued Robles for excessive force and failure to intervene, pursuant to § 1983 and New York State law, in connection with the July 15, 2013 incident in which Plaintiff was

---

[13] At a conference on January 12, 2018, the Court discussed the scope of expert discovery with the parties; Plaintiff stated that he would call an expert in "police practices and procedure" and an expert in "Department of Corrections procedures." Tr. of Jan. 12, 2018 Conf. at 3. Plaintiff made no mention at this conference that he required any expert witnesses on the issue of emotional distress. *See id.* After Defendants submitted their motion for summary judgment, the Court allowed Plaintiff to explain whether he required expert witnesses to respond to Defendants' motion. *See* Order (May 4, 2018), Dkt. 83. Plaintiff stated that he required an expert on "police practices" to respond to the motion, *see* Ltr. (June 15, 2018), Dkt. 90, and the Court allowed Plaintiff to include that expert's testimony in his response papers, *see* Order (July 9, 2018), Dkt. 97; *see also* Pollini Decl. But Plaintiff again did not indicate that he needed an expert witness to help prove his IIED claim. In short, Plaintiff had every opportunity to submit expert testimony relating to emotional distress; Plaintiff simply chose not to.

extracted from his cell on Rikers Island. *See* SAC ¶¶ 150–158, 174–189. Robles moves for summary judgment on these claims.

"[T]he right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment," and, thus, may form the basis of a § 1983 claim. *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). In order to hold a defendant liable on such a claim, a plaintiff must show that the defendant was personally involved in the constitutional violation. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("It is well-settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994))); *see also Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001); *Sash v. United States*, 674 F. Supp. 2d 531, 542 (S.D.N.Y. 2009) (collecting cases).

A plaintiff may show "personal involvement" by, among other things, showing that the defendant "direct[ly] participated" in the violation, that is, that the defendant intentionally participated "in the conduct constituting a violation of the victim's rights" and that he "knew of the facts rendering it illegal." *Provost*, 262 F.3d at 155 (footnote omitted). Alternatively, the plaintiff may show that the defendant failed to intervene to protect the plaintiff from a violation of his constitutional rights by another person. *See Anderson*, 17 F.3d at 557. In order to establish liability for failure to intervene, the plaintiff must show, among other things, that the defendant had "a realistic opportunity to intervene to prevent the harm from occurring." *Id.*

Plaintiff argues that corrections officers used excessive force against him during the July 15, 2013 cell extraction because they kicked and punched him after he was handcuffed. *See*

Pl.'s Mem. of Law at 6, 20–22. This incident involved a team of six or more corrections officers. *See* Defs.' 56.1 Stmt. ¶¶ 70, 74; Defs.' Ex. Q at 00:50–1:45. Plaintiff, however, has not sued all of the corrections officers involved; he has sued only one, Daniel Robles. *See* Defs.' 56.1 Stmt. ¶ 59; Pl.'s 56.1 Stmt. ¶ 59. Even assuming that Plaintiff's allegations are true, Plaintiff has offered no evidence that Robles, as opposed to one of the other officers, punched and kicked him. *See* Pl.'s Mem. of Law at 6, 20–22; Defs.' 56.1 Stmt. ¶ 74; Pl.'s 56.1 Stmt. ¶ 74. Nor has Plaintiff offered any explanation why he sued Robles but did not—after extensive discovery and two amended complaints—sue any of the other members of the extraction team. *See* Defs.' 56.1 Stmt. ¶ 59; Pl.'s 56.1 Stmt. ¶ 59. Because the record contains no evidence from which a reasonable juror could infer that Robles is personally responsible for any deprivation of Plaintiff's constitutional rights, Robles's motion for summary judgment is granted.

Turning to the evidence that is in the record, Plaintiff testified in his deposition that an unspecified number of officers "hit" and "kicked" him, but Plaintiff did not offer any other details about the incident in his testimony (or, at least, in the portions of his testimony that were submitted to this Court). Defs.' Ex. D at 218; Pl.'s Ex. C at 217. Plaintiff did not submit an affidavit or declaration clarifying this vague testimony. Although Robles was deposed, he could not remember anything about the incident. *See* Pl.'s Ex. D. Amazingly, Plaintiff failed to depose any of the other corrections officers who were involved in the incident (or, at least, Plaintiff did not include any of their deposition testimony in his response to Defendants' motion for summary judgment).[14] Finally, although the extraction incident was captured on video, the video does not make clear which (if any) officers punched or kicked Plaintiff, as the officers

---

[14] In a video of the incident, each member of the extraction team identified himself by name and shield number. *See* Defs.' Ex Q at 1:00–1:40. Plaintiff, therefore, has no excuse for failing to conduct discovery of these individuals.

were all surrounding Plaintiff in a huddle during this time. *See* Defs.' Ex. Q at 9:30–10:45. In short, Plaintiff has offered no evidence tending to show that it was Robles who punched or kicked him, other than Robles's presence at the scene with at least five other officers. As to those other officers, Plaintiff has offered no evidence whatsoever to distinguish Robles's actions from theirs. *See* Defs.' 56.1 Stmt. ¶ 59; Pl.'s 56.1 Stmt. ¶ 59 (Plaintiff admits that "[t]he only individually named defendant in this case who was involved in the July 15, 2013 incident is Daniel Robles"); *id.* ¶ 74 (Plaintiff offers no evidence to dispute that he "cannot identify what specific actions . . . Robles took against him"). Essentially, Plaintiff—without any rhyme or reason—has picked Robles's name out of a hat and selected him as the person who should be held responsible for the July 15, 2013 incident. Under these circumstances, Robles is entitled to summary judgment.[15]

The Court is mindful that plaintiffs are permitted to prove their cases—and to defeat summary judgment—exclusively through circumstantial evidence. Indeed, in other § 1983 cases, courts have denied summary judgment when the plaintiff offered some circumstantial evidence that the defendant caused his injuries, even if the plaintiff could not definitively say who was responsible.[16] Here, however, Plaintiff has failed to offer *any* facts tending to show that

---

[15]     *See Provost*, 262 F.3d at 155; *see also, e.g.*, *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 291–92 (3d Cir. 2018) (affirming grant of defendants' motion for summary judgment in an excessive-force case when the plaintiff "filed suit against only four of the five [officers involved] and still [could not] identify the actor that kicked him"); *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (affirming grant of defendants' motion for summary judgment when the plaintiff sued only four out of ten officers involved in an allegedly illegal search and the plaintiff "admitted that he was unable to identify which of the ten searching officers" were responsible); *Kornegay v. Doe*, 371 F. App'x 178, 179 (2d Cir. 2010) (affirming grant of defendants' motion for judgment as a matter of law in a § 1983 claim when the plaintiff, "in his own sworn testimony . . . failed to attribute specific actions to any individual defendant"); *Husbands ex rel. Forde v. City of New York*, 335 F. App'x 124, 129 (2d Cir. 2009); *Rasmussen v. City of New York*, 766 F. Supp. 2d 399, 411–12 (E.D.N.Y. 2011).

[16]     *See, e.g.*, *Medina v. Donaldson*, No. 10-CV-5922, 2014 WL 1010951, at *14 (E.D.N.Y. Mar. 14, 2014) (denying defendant's motion for a judgment as a matter of law; a reasonable juror could find that the defendant caused the plaintiff's injuries based on evidence of the defendant's physical position during the incident, his "arguably violent actions" in the moments preceding the assault, and inconsistencies in the testimony of the other officers involved); *Lasher v. City of Schenectady*, No. 02-CV-1395, 2004 WL 1732006, at *7 (N.D.N.Y. Aug. 3,

it was Robles who punched or kicked him while he was handcuffed, other than Robles's presence at the scene.  Based on this record, no reasonable juror could find, by a preponderance of the evidence, that Robles assaulted Plaintiff.  *See Rasmussen*, 766 F. Supp. 2d at 411–12; *cf. Burley v. Gagacki*, 729 F.3d 610, 620 (6th Cir. 2013) ("As a general rule, mere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability.").

Nor could any reasonable juror find Robles liable pursuant to a failure-to-intervene theory.  That theory requires Plaintiff to prove that Robles had "a realistic opportunity to intervene to prevent the harm from occurring." *Anderson*, 17 F.3d at 557.  Whether, as a matter of law, a defendant had a realistic opportunity to intervene turns on the duration of the alleged assault, "the number of officers present, their relative placement, the environment in which they acted, [and] the nature of the assault," among other factors.  *Figueroa v. Mazza*, 825 F.3d 89, 107–08 (2d Cir. 2016).  Plaintiff offers no evidence about these details.  *See* Defs.' Ex. D at 218; Pl.'s Ex. C at 217.  He fails to explain, for example, whether the punches and kicks occurred "in rapid succession," in which case Robles would not have had an opportunity to intervene as a matter of law, *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988), or whether the assault was "an extended sequence of events during which a bystander could have intervened and prevented further harm," *Burks v. City of New York*, No. 17-CV-177, 2018 WL 6199550, at *6 (E.D.N.Y. Nov. 28, 2018).  Because Plaintiff would bear the burden of proving at trial that

---

2004) (denying defendant's motion for summary judgment because the plaintiff's testimony about the height of the officer who assaulted him matched the defendant's height).

Robles had a realistic opportunity to intervene, Plaintiff's failure to offer evidence on this point is fatal. *See Celotex*, 477 U.S. at 322.[17]

Plaintiff defends his failure to proffer evidence of Robles's involvement on the ground that Plaintiff "was not asked during his deposition if he remembered specific actions . . . [that] Robles took against him." Pl.'s 56.1 Stmt. ¶ 74. This argument is meritless. Because Defendant submitted a proper motion for summary judgment, Plaintiff bears the burden of "set[ting] forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also id.* at 257 ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."). As is often said, "[t]he mere existence of a scintilla of evidence" is insufficient to make this showing; "there must be evidence on which the jury could reasonably find for the plaintiff." *id.* at 252; *see also id.* at 249–50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (citations omitted)); *see also Celotex*, 477 U.S. at 322. Plaintiff has utterly failed to put forward any probative evidence that Robles violated his constitutional rights.[18]

---

[17] The Court also notes that the time during which officers could have hit and kicked Plaintiff lasted only approximately 30 seconds, judging from a video of the incident. *See* Defs.' Ex. Q at 9:45–10:20. At least one court has held that this amount of time is insufficient for a reasonable jury to conclude that the defendant had a realistic opportunity to intervene. *See Sash*, 674 F. Supp. 2d at 545.

Plaintiff's excessive-force claims focus on the officers' alleged kicks and punches during the cell extraction. *See* Pl.'s Mem. of Law at 20–21. To the extent that Plaintiff argues that the officers' acts of spraying him with a chemical agent and of removing him from his cell constitute excessive force, his argument would fail. No reasonable juror could find that these applications of force were excessive, in light of the safety risks that Plaintiff's actions posed, the intermediate steps that the officers took before using force (including ordering Plaintiff to remove his hand and having a mental health professional speak with Plaintiff), and the minimal injuries that Plaintiff sustained. *See* Defs.' 56.1 Stmt. ¶¶ 64–68. In addition, as the Court has discussed, Plaintiff has failed to establish Robles's personal involvement in these or any other actions.

[18] Plaintiff also argues that he need not offer evidence of Robles's personal involvement because Robles was "obviously acting in concert with the other officers" in depriving Plaintiff of his constitutional rights. Pl.'s Mem. of Law at 22. Putting aside the conclusory nature of this assertion (which is made without any citations to the record), Plaintiff has not brought a claim for § 1983 conspiracy, of which "acting in concert" would be an element. *See Samuels v. Fischer*, 168 F. Supp. 3d 625, 650 n.13 (S.D.N.Y. 2016). Rather, Plaintiff has brought a substantive

For all these reasons, Defendants motion for summary judgment is granted on Plaintiff's

§ 1983 claim for excessive force.[19]

## V.    Plaintiff Is Ordered to Show Cause Why the Claim Relating to His October 12, 2013 Slip-and-Fall Should Not Be Dismissed for Lack of Subject-Matter Jurisdiction

Plaintiff brings a state-law claim for negligence against the City of New York, alleging

that Rikers Island corrections officers caused him to slip and fall in a shower area on October 12,

2013.  *See* SAC ¶ 190–199.  Defendants move for summary judgment on this claim but have not

addressed whether the Court properly has subject-matter jurisdiction over it.

Federal courts can exercise supplemental jurisdiction over state-law claims only if the

claims "are so related to claims in the action within [the Court's] original jurisdiction that they

form part of the same case or controversy under Article III of the United States Constitution."

28 U.S.C. § 1367(a).  "Claims 'form part of the same case or controversy' if they 'derive from a

common nucleus of operative fact.'"  *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d

234, 245 (2d Cir. 2011) (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296,

308 (2d Cir. 2004)).  "In determining whether two disputes arise from a 'common nucleus of

operative fact,' [courts] have traditionally asked whether 'the facts underlying the federal and

state claims substantially overlapped . . . [or] the federal claim necessarily brought the facts

underlying the state claim before the court.'"  *Achtman v. Kirby, McInerney & Squire, LLP*, 464

F.3d 328, 335 (2d Cir. 2006) (quoting *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d

---

§ 1983 claim, for which there is "no basis for vicarious or shared liability" among different officers.  *Rasmussen*, 766 F. Supp. 2d at 412.

[19]    Although Plaintiff's state-law claim for excessive force does not contain the same "personal involvement" requirement as his § 1983 claim, the state claim—like any other intentional tort—requires Plaintiff to prove that Robles's actions proximately caused his injuries.  *See Hain v. Jamison*, 28 N.Y.3d 524, 528 (2016); *Reynolds v. State*, 118 A.D.3d 1496, 1496 (4th Dep't 2014); *Rodriguez v. City of New York*, 112 A.D.3d 905, 907 (2d Dep't 2013); *Flores v. Dearborne Mgmt., Inc.*, 24 A.D.3d 101, 102 (1st Dep't 2005).  Because Plaintiff has failed to offer any evidence of this element, his state-law claim also fails.

697, 704 (2d Cir. 2000)). Courts "have found pendent jurisdiction lacking when the federal and state claims rested on essentially unrelated facts." *Lyndonville*, 211 F.3d at 704 (collecting cases); *see also, e.g.*, *Kirschner v. Klemons*, 225 F.3d 227, 239 (2d Cir. 2000).

The Court has jurisdiction over this action pursuant to the Court's federal-question jurisdiction, based on Plaintiff's § 1983 claims for malicious prosecution and excessive force.[20] *See* SAC ¶¶ 2–4. Thus, this Court has jurisdiction over Plaintiff's state-law claims only if they "form part of the same case or controversy" as the § 1983 claims. 28 U.S.C. § 1367(a); *see also Shahriar*, 659 F.3d at 245. Plaintiff's claim relating to the slip-and-fall has no factual overlap whatsoever with his § 1983 claims. Among other things, the slip-and-fall claim involves different state actors, a different time period, and an entirely different injury than either of Plaintiff's § 1983 claims. *See* Defs.' 56.1 Stmt. ¶¶ 80–83; Pl.'s 56.1 Stmt. ¶ 118. This Court, therefore, has no jurisdiction to adjudicate Plaintiff's slip-and-fall claim; accordingly, this claim warrants dismissal.

The Court is aware, however, that it has raised this issue *sua sponte*, as Defendants did not move to dismiss this claim based on lack of subject-matter jurisdiction.[21] The Court, therefore, will allow Plaintiff until **March 22, 2019** to show cause why the slip-and-fall claim should not be dismissed for lack of subject-matter jurisdiction. Defendants may respond no later

---

[20] Plaintiff is a citizen of the same state as Defendants and, thus, does not rely on the Court's diversity jurisdiction. *See* SAC ¶ 9.

[21] Defendants argued in their motion for summary judgment that the Court, in its discretion, should decline to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(c)(3). *See* Defs.' Mem. of Law at 27. This argument missed the mark: because the slip-and-fall claim does not arise out of the same case or controversy as Plaintiff's § 1983 claims, this Court has no discretion to exercise supplemental jurisdiction over it. Plaintiff, therefore, has not yet had an opportunity to respond to the argument that the Court lacks subject-matter jurisdiction over the claim altogether.

than **March 29, 2019**.  If Plaintiff fails to timely explain why this Court has subject-matter jurisdiction over the slip-and-fall claim, the claim will be dismissed.

## VI.     The Balance of Plaintiff's Claims

### A.     Plaintiff's Claim Against Robles for Malicious Prosecution

Plaintiff also brings a claim against Robles for malicious prosecution, alleging that the punishments that Plaintiff received on Rikers Island for disciplinary infractions were "retaliatory" and lacked probable cause.  SAC ¶¶ 132–143.  Although Robles moved for summary judgment on this claim, *see* Defs.' Mem. of Law at 22, 30, Plaintiff offers no facts at all to support it, other than the conclusory assertion that "[i]t was clear that [his] placement in solitary confinement was punitive and retaliatory" and deposition testimony that falls far short of establishing Robles's personal involvement, malice, a lack of probable cause, or any of the other elements of the claim, *see* Pl.'s Mem. of Law at 24–25.  Accordingly, Defendants' motion for summary judgment is also granted on this claim.

### B.     Plaintiff's Claims Against the City of New York

The balance of Plaintiff's claims are against the City of New York.  Plaintiff brings claims against the City for malicious prosecution and excessive force pursuant to § 1983 and *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).  *See* SAC ¶¶ 200–244.  He also brings all of his state-law claims against the City pursuant to a *respondeat superior* theory.  *See id.*  On May 4, 2018, after discovery closed, the Court severed and stayed these claims pending resolution of Defendants' motion for summary judgment.  *See* Order, Dkt. 83.

All of Plaintiff's claims against the City are dismissed, with the exception of the slip-and-fall claim and the claims arising out of the July 15, 2013 extraction incident.  With the exception of those claims, Plaintiff has failed to establish that he suffered a constitutional violation or any

other cognizable injury. Because *Monell* and *respondeat superior* liability is inherently

derivative of individual liability, the City is not liable for those claims as a matter of law.

*See Bolden v. Cty. of Sullivan*, 523 F. App'x 832, 834 (2d Cir. 2013) (citing *Segal v. City of New

York*, 459 F.3d 207, 219 (2d Cir. 2006)); *Escalera v. Lunn*, 361 F.3d 737, 749 (2d Cir. 2004);

*Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999); *Du Chateau v. Metro-North

Commuter R. Co.*, 253 A.D.2d 128, 131 (1st Dep't 1999).

As to the claims relating to the extraction incident (excessive force and failure to

intervene), the Court has not ruled out the possibility that Plaintiff suffered a constitutional

violation; the Court has ruled only that Plaintiff failed to show that the named defendant, Robles,

was responsible for the alleged violation. Accordingly, the Court will not dismiss these claims at

this time. No later than **March 22, 2019**, Plaintiff must show cause why his claims against the

City for excessive force and failure to intervene should not be dismissed. Defendants may

respond no later than **March 29, 2019**. If Plaintiff fails to show timely cause, these claims will

be dismissed.[22]

## CONCLUSION

For all the foregoing reasons, Defendants' motion for summary judgment is GRANTED.

All of Plaintiff's claims are DISMISSED, with the exception of his claim against the City of

---

[22] Ordinarily, the Court would order Defendants to move for summary judgment on Plaintiff's remaining claims. Plaintiff, however, has failed to conduct any discovery on his *Monell* claims, despite having ample time to do so. *See* Tr. of May 19, 2017 Conf. at 9 (Plaintiff agrees to "proceed with discovery on *Monell*" concurrent with discovery on his claims against the individual defendants); Tr. of Nov. 3, 2017 Conf. at 5–6, 13 (Plaintiff states that he inadvertently failed to serve discovery demands relating to his *Monell* claims; the Court denies Plaintiff's request to reopen *Monell* discovery). The Court, therefore, has serious doubts that Plaintiff's claims could withstand a motion for summary judgment. As the Court has discussed, moreover, Plaintiff's sloppy and dilatory practices have already caused Defendants to incur substantial costs without good reason. In light of these circumstances, the Court is ordering Plaintiff to show cause why the claims should not be dismissed, instead of requiring Defendants to expend resources filing another motion for summary judgment. *See* Fed. R. Civ. P. 56(f) (Court may grant summary judgment on its own motion after providing notice and a reasonable time to respond).

New York for negligence arising out of the October 12, 2013 slip-and-fall incident and his claims against the City of New York for excessive force and failure to intervene arising out of the July 15, 2013 cell extraction. No later than **March 22, 2019**, Plaintiff must show cause why those claims should not be dismissed. Defendants may respond no later than **March 29, 2019**. There will be no reply. The parties submissions must be in **letter format** and may not exceed **five pages**. If Plaintiff fails to show timely cause, these claims will be dismissed, and this action will be closed.

The Clerk of Court is respectfully directed to CLOSE the open motions at Dkts. 86 and 107.

**SO ORDERED.**

Date:  **March 11, 2019**
      **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**